19-3075. Mr. DiCastro. Good morning, your honors. May it please the court. Cesar DiCastro on behalf of Appellant Yesenia Jimenez. I'd like to use my time today to address the Batson and cross examination issues if I could. With respect to Batson, the prosecution violated Ms. Jimenez's rights by striking three of the four Hispanic jurors from the jury panel. This court should reverse for it for two reasons. First, the government's explanations for striking the Hispanic women from the jury, analyzed in the totality of the circumstances, show that they were pretextual. They wanted to exclude jurors that looked like Ms. Jimenez. Second, the court engaged in virtually no analysis after the government gave its explanations. It simply credited the government's explanations and denied the challenge and we moved on with the trial. The government proffered sort of two categories of explanations for the exclusions of the three Hispanic women. The first was their family members that had convictions for criminal offenses. Five jurors had relatives who had been convicted of crimes. Two were Hispanic females. Both were struck by the government. The others were not. Neither of the two jurors that were excluded presented with any resentment towards those criminal prosecutions. In fact, neither of the two had really any detail regarding their family member's case. Juror number four didn't know any details of her father's case. She thought it might have been a firearms case, but the court engaged in no real follow-up, no real analysis in terms of what about the case, if anything, gave the person pause. Juror number 12, likewise, her uncle had, I believe, a narcotics conviction, but she was also very unfamiliar with the details. The second proffered reason the government excluded the jurors was their expressed opinions related to narcotics. Again, there was very little follow-up with respect to the details of the jurors' opinions, neither at sidebar or in open court. The record is very unclear on the specifics of the problems the jurors themselves had. Juror number 16 was a Hispanic female that was struck by the government. Again, very little detail, and we don't even know whether those opinions were probed. Yeah. Mr. DeCastro, this is Judge Lillier. As I think you know, we have an extremely deferential standard of review for facts and challenges, right or wrong. I think that the standard of review here, at least in the consciousness case, is whether the district judge clearly erred in finding that the reasons provided by the government rebutted any suggestion of discrimination. You say very little detail, but any amount of detail that supports what's, in effect, a credibility determination is enough, it seems to me. So, what is it, given that extremely deferential standard, that we can identify as clear error? Well, I think two things. One, you can do the analysis that the district court did not do. If she did do the analysis, it wasn't articulated in any sort of way. It was very quick. We're doing the analysis for the first time here on appeal, and when I say the analysis, we're looking at other jurors that the government struck or did not strike, discussing that. Instead, what you see from this record, and I understand the deferential standard, but the record shows that, of course, the transcript doesn't have a timestamp in terms of each The court was very quick to immediately dismiss the challenge that was made and credit the government's explanations without even analyzing or even providing for this court an insight into her thought process as to why she felt those answers were appropriate. So, yes, the court is clearly deferential, but I think there is precedent in this court. Jordan, for example, and Barnes, those are cases where at least the court is expressing that there has to be, at prong three, that the court does lay out its rationale and can't just simply say, okay, that sounds good and let's move on. There has to be a comparison to maybe what else was happening. We did all of this. Judge Bonacci, do you have any questions? Oh, sure. Yeah. So, I mean, on this question, so you had said that other jurors had relatives who had been convicted of offenses, but juror four was the only one whose father was convicted of a firearms offense, right, which was an offense that issue in this particular case. Wouldn't that be a difference between juror four and other jurors? First, we had no idea. What the juror said was, I think it was a gun case, but she didn't know. She literally had no idea about the fact that she was a child at the time and apparently had not learned any more details of it in time, and so nothing was discussed. There was no detail there, and so just because it was another- But might the government have thought that because her father was convicted of a firearms offense that might affect her? I mean, is it not at all possible that somebody might think that that would be a reason for striking the juror? Of course, that could be a legitimate reason. We're not making the argument that there aren't legitimate reasons. It's that you have to look at the totality of the circumstances. Number one, as a trial lawyer in this district, I was hoping, I guess, to have at least jurors that were Hispanic females on that juror as representative of my client. I was delighted to see that there were four, and I raised the challenge. I understand that. Okay, then in juror 12, wasn't juror 12 asked by the court whether the brother's murder would affect her ability to be fair, and she said that she wasn't sure she could be fair, and she had resentment toward the police because of that experience? I don't think it was that clear, Your Honor. I think that she wasn't sure if it was fair. I think that that's really not where the government was, the way I see the record, where they were complaining about juror number 12. They really were saying that their reasons they gave, and of course the analysis is were the reasons they gave indicative of pretext or not, was that of this prior conviction that she didn't really know anything about of her uncle. Okay, well, I just have two other questions. So the one about the social activities, so Mr. Soto testifying to the, sorry, Mr. Morrell testifying to the social activities, there was a lot of testimony that they had a social relationship. So the extra testimony about knowing the children or so on, how would that have made a outcome of the case? So in the cross-examination point, the larger picture of this was that I don't think our challenge is really, okay, not letting us just ask about the child, right? One that was sort of setting the stage a little bit for how close he was with the family, how close he was to know their children and know different family members. The most important aspect that I take from that, our cross-examination point is the following, which is that we were entitled to present a case that the trips were primarily social for Ms. Jimenez. What the judge did was made a ruling and a finding that these were dual purpose trips, and the only thing she was going to let me do, and it was very clear, and she was very clear about it, is that I could establish that there were dual purpose for the trips. She stepped into the role of the fact finder. That's what a trial is for. We're allowed to present that it was purely social for Ms. Jimenez. The government was permitted to put in everything about drug dealing, and that's fine. And what she- Did the judge actually make a ruling that they were dual purpose trips, or in response to your argument that showing that they had a social relationship would show that they were not criminal trips, the judge said, well, they could be both, and so I don't think that that theory would preclude the showing that there was a criminal activity going on. Right, so in essence, her ruling was the following. I guess it wasn't an explicit order, which was, I'm going to exclude anything that doesn't show, that shows that it's purely social. And so, you know, the government, for example, I'd ask you to flip the fact pattern for a second in the hypothetical and say, if the government had photos from one of the defendant's phones that showed that the defendants were spending lots of money, possessing cash in a social atmosphere, they would have been seeking to introduce those photos and arguing that these social aspects of the trip were related to the drug dealing, they were spending the proceeds of their criminality. And you know what, they would have, should have been and would have been allowed to do that. They do it all the time, there's no issue really, and we generally don't have much argument to preclude that on the defense side. But I should have been allowed to pursue my theory, which was that if Mr. Morrell and Mr. Soto were engaged in drug dealing, we were not, it was purely social. We, Ms. Jimenez, was spending time with other members of the family on trips to the lake or whatever, or just hanging out. And I had hundreds of photos. I didn't ask to introduce hundreds of them, I asked to introduce two. And, you know, the case was clear. So then just on this question about her being social, do you have an explanation for the trips she took in the middle of the night at three or four in the morning to Boston? I don't think there was a single trip that she went up and didn't stay overnight. So there were overnight trips for her, and sometimes they were at night. And if we were permitted to explore it, I mean, I could tell you she was an officer getting off at all different hours. And so sometimes they would drive up, you know, very, very late. Okay, I understand that. But just as a follow up to that question, were you not permitted to argue to the jury that these were social visits? We certainly were permitted to argue to the jury, but we were also, I believe we should have been permitted to introduce the evidence of that. And so being allowed, you know, a jury sitting there saying, oh, well, where's the evidence of all this social, of all this, of it being purely social? Well, I wasn't allowed to do that. Judge Manesha interrupted you, I think, I'm sorry. No, that's fine. I think we can move on. Thanks very much. Judge Committee? Just a quick question on the Batson issue. Did the government use all of its peremptory strikes here? I believe, I believe it did. That's a very good question. I believe it did. I believe they did. I know Mr. Wren will correct me if I'm wrong. I'm just looking for the record. I believe they did, yes. We can hear from the governor on that. And then just quickly on the cross-examination issue, like what would your limiting principle be? Presumably, if you'd wanted to introduce a hundred photos, the court would have been within its rights to say no. So where is the line in your view? For sure. I mean, I didn't, and just to be clear, it wasn't, you know, I didn't have a hundred and asked to do a hundred and prepared to do a hundred. I mean, in general, you know, the case was pretty tight. We were pretty, there was no lengthy cross-examinations. You know, I tried to be as tight as possible. And then we ran into roadblocks here and there, as we do in trials. You know, I don't know. I think in the context of this case alone, I think that, I don't know, a half a dozen wouldn't have been a big deal, depending on each photo. Of course, the government could look at individual photos and say, you know, there's an issue with this one because I don't know, maybe you're showing a kid's birthday party or something and you don't want to show too much sympathy or something like that. I suppose they could make that argument. I simply wanted to show that there was documented photographic evidence of her engaged in social events there to make that argument. The government certainly could then say, well, you know, you heard from our cooperator. Here's all of the evidence of the, that they were doing other stuff and that it was dual. And, you know, I would note that the government's original argument in this case, I guess, an opening was really that this is only drug runs, drug runs, drug runs. And then they shifted as they can in their summation to say they were dual purpose. Thank you. Yeah. Thank you. Judge Committee, any other questions? No, not for me. Thank you. Okay. Conference recording has stopped. Oh, I don't know what that means. We'll turn then to the government, Mr. Ren. Yes. Good morning and may it please the court. I am Thane Ren and I represent the government in case. And I also represented the government. This conference is being recorded. Only the main conference is recorded. Please proceed. There was no Batson error in this case, let alone clear error of the sort that would warrant reversal under the standard of review that's applicable here. The prosecution offered race and gender neutral explanations for its juror strikes. And Judge Caproni found those explanations to be credible. And notably the basis for each of those explanations is clear from the record. And these explanations identified reasons that were unique to the jurors who were struck. With respect to the cross-examination issue, the district court committed no error in limiting cross-examination of one of the government's witnesses. The precluded cross-examination dealt with topics that were uncontested regarding the fact that there was socialization on some of these trips to Boston. Facts that the witness who was being cross-examined had already acknowledged. And facts that were entirely collateral to the issues in dispute at trial. And of marginal relevance at best. Given the district court's significant discretion in directing the mode of examination of witnesses, there was no error here. And again, certainly no reversible error, especially given that the court would have to find that any error was not harmless. And given the overwhelming evidence of guilt here, it's clear that even if the court were to find that there was error, it would be harmless. So, are you relying, at least in part, on harmlessness with respect to that possible error? If the court were to find that there was an error, we would submit that it was indeed harmless given the overwhelming evidence of guilt in the case and the marginal nature of the examination that was affected by it. But our primary argument would be that there was no error here. It was clear that the district court had legitimate concerns about the purpose of this cross-examination, especially in light of comments that had been made by the defense counsel in its opening statement suggesting that the defense counsel was trying to put sympathy for the defendant at issue at the trial. And so, given that context, the court's decision to limit the admission of photographs documenting events that had already been acknowledged to have existed and that weren't in dispute was an appropriate exercise of the court's discretion. And how about, Mr. Wren, the Doyle issue, that is the summation issue, where there's a reference to statements when she was being arrested. Are you also relying on harmlessness with respect to that issue? Yes, Your Honor. If the court were to find that there was an error, the government submits that any error was harmless. But primarily, we argue that there was no improper comment by the prosecution during the summation. The comment challenged by the defense when it's looked at in context was a reference to the defendant's conduct and statements made before the defendant was arrested, and it was therefore a fully permissible argument for the government to be making. And Judge Caproni specifically recognized that there was no intent by the prosecution to comment on any post-arrest silence. Now, I acknowledge that in looking at it sort of on the page in black and white, it is somewhat inartfully phrased. On a cold record, it's not great. I acknowledge that, Your Honor. It's inartfully phrased, and I think looking at it as a cold record, there is some interpretive ambiguity about it. But I think that that would be to divorce it from the context of the remark, which we tried to explain more fully in our brief. This was an unusual case in which the defendant had engaged with law enforcement prior to being arrested, prior to any Miranda warnings, and had made certain statements that the prosecution argued to the jury were inconsistent with the version of events that the defendant testified about at trial. And it was, of course, fully permissible for the prosecution to draw out that inconsistency and explain that an innocent person wouldn't have acted the way the defendant did when the initial contact with law enforcement prior to the defendant's arrest took place. Now, again, I think you've pointed out that if you look at the sort of the statements right at the end of that lengthy excerpt that we've provided in our brief, it is inartfully phrased, and I think we would acknowledge that. But we would admit that Judge Caproni, I think, appropriately recognized that there was no intent to comment on post-arrest silence. There was no discussion at trial whatsoever of any post-arrest. I'm not actually ever persuaded by intent. It's the effect on the jury that's the issue. But what you're describing is that the combination of the curative instruction plus the, as you put it, connection with the cross-examination issue, the overwhelming evidence of guilt on the charge counts here, that's enough. Yes, Your Honor. Even if the court were to find that the comment was over the line, the judge promptly granted the defendant's request for a curative instruction, which the jury is presumed to follow. And ultimately, I think the overall trial record here is quite clear that any error was harmless to the extent that there were errors. And there's a number of cases with similar facts, a passing comment by the prosecution, where this court and other courts of appeals have recognized that even if that comment were error, it was harmless in the overall context of the case and the strength of the evidence of trial, which in this case in particular, the evidence of trial was over the line. Can you tell me the context? Yeah, can you tell me the context of it? So, you'd said in summation, wouldn't that be something you would mention when you're being arrested? Like, it would be something that you would tell the agents that night. I mean, how is that, what is the context that shows that you're not talking about what she would have done after being arrested? Yes, Your Honor. So, it was undisputed and it was testified to both by the arresting agent and by the defendant that prior to the defendant being placed under arrest, she had shown her badge and had told the DEA agents who were on the scene that she was, quote, on the job. And when she testified at trial, she claimed that immediately before that in cash in her handbag. So, the argument that the prosecution was making here is that. So, you're saying she would have said something in the process of being arrested to explain what was going on and that's not the same thing as saying she should have said something after being arrested. Yes, I think, again, that's where the inartful phrasing comes in. It's not really a reference to being arrested. It's a reference to being approached by law enforcement. The intent here is to say, law enforcement approached you. You've just discovered this highly suspicious circumstance. You yourself are a law enforcement officer. An innocent person wouldn't essentially attempt to wave off. But you are saying, you were telling the jury to make an inference about her guilt from her failure to say more when being approached by law enforcement that obviously was going and they were going to arrest her. No? Well, it wasn't clear at that point in time that they were going to arrest her. And in fact, she wasn't arrested until several minutes later after they had conducted some additional investigation. They had yet to discover the cash at that point in time. If I could just jump in there. This is Judge Committee. I read the statement that wouldn't this be something you would mention to refer to potentially the moment of the discovery of the cash. And so, can you just clarify the timeline for us? You know, the relationship between the discovery of the money in her purse and the timing of her arrest? Yes. So, they had pulled into their apartment in their car, at which point they were approached by the DEA agent. The DEA agents at this point in time are not planning to arrest because they have yet to see circumstances that would give rise to a basis to arrest. According to her testimony, she had just woken up in the car and discovered that unexpectedly to her, there were, you know, tens of thousands of dollars of cash in her handbag. And then she gets out of the car, shows her badge and says, I'm on the job to the officers. Subsequent to that, the officers discover that there's cash in her bag. They conduct additional... They discover the cash in her bag after she's placed under arrest or before? Before she's placed under arrest, but after she makes that comment, attempting to wave them off. And so, what we're arguing is basically that, you know, she made this comment when being approached by law enforcement prior to being placed under arrest, prior to them discovering the incriminating evidence, but after she herself has admitted she knows about it. And so, that's what we're saying, is that making that comment to essentially try to get them to leave is not the way that an innocent person would have behaved in that circumstance. And that is a permissible argument. I think everybody would agree that there's no error in the prosecution commenting on a defendant's pre-arrest, pre-Miranda statements or silence. But I think we have some agreement on this call that saying, wouldn't that be something you had arrested? It's hard to interpret that phrasing as referring exclusively to the pre-arrest period. And that's certainly, I think, a fair point. And as I've said, it's certainly not a phrasing. When I looked at it after the fact, I realized why the objection had been made. I think Judge Caproni, who was, you know, in the courtroom and had sort of seen the whole context and had seen the underlying trial testimony, made the correct ruling that that wasn't the intent of the prosecution. But in an abundance of caution, she did provide that curative instruction. So, if it does seem to suggest to the jury that they should infer something from her failure to say something even after being arrested, is the curative instruction enough? I mean, it's not as if the curative instruction says that isn't actually evidence of guilt. It just sort of says you're not allowed to rely on it. You should ignore what you've just heard from the government. Your Honor, I think that the instruction is appropriate. I think it's in line with the way that courts typically would instruct juries after something has been said, whether it's by a witness or by an attorney, that the jury is to disregard. And I think that, you know, both parties agreed that the instruction was appropriate under the circumstances. And so, given that and given that the jury is presumed to follow that instruction, I think that the court can rely on that as one of the bases for finding harmless error. Of course, even without the court can consider the overall trial record as a harmless misdemeanor as well. I have one other question going back to the Batson issue. So, what about the argument opposing counsel made a moment ago, which is that the district court really should have conducted some analysis and not just accepted the government's assertion? Why shouldn't we say the district court should have said, well, here's the government's argument for why this was a permissible reason to strike the juror, and I find it persuasive for this or that reason in context of the overall circumstances. I think that what the Batson cases say is that it's a very, very fact-specific situation. You're dealing here with a situation where Jessica Proney had observed the jury voir dire, was observing the reasons being offered by the prosecution, made it clear that she remembered the specific responses that the jurors had provided that had led to the prosecution's strikes. And given her clear familiarity with facts that she had observed within just a few minutes before this occurred, there wasn't the need to make a lengthy record that there might be in some cases. And I think that there are a number of cases where courts have upheld a judge's accepting of a prosecution's explanations that are clearly supported by the record without the need for searching additional inquiry. I think it's important to note here that, as I mentioned earlier, each of these reasons were unique to these particular jurors and were tied to issues of particular concern in this particular case. So I had mentioned the firearms offense of that juror's father, and opposing counsel said, well, she didn't even remember the circumstances of that offense. Do you agree with that account? I don't agree. I don't agree with that phrasing. I mean, it's the relevant section is A257 of the appendix. And she said that her father was in jail, that she believed it was for firearm possession. And, you know, notably, she said that her father was in jail while she was growing up. And so, you know, I think there was a reason for the prosecution to be concerned that even if this juror said it wouldn't affect her ability to be fair at trial, having that level of sort of an immediate family member's involvement with the law enforcement system over an offense that was one of the offenses charged in the case. Although, Mr. Ben, was there not another, just to follow up on that, prospective juror whose cousin was convicted? Maybe this is why you said immediate family member, but was convicted of a drug trafficking felony. And that was obviously implicated in this case. You didn't strike that juror. Your Honor, there was a prospective juror who said that her mother's cousin had had a drug conviction approximately 25 years ago. That's at appendix 333. We would submit that a mother's cousin's drug conviction in the distant past is different from somebody's father being in jail for an offense that's charged in the case while that person was growing up. And I think it was a valid reason for the prosecution to be more concerned about prospective juror or than that other juror whose mother's cousin had had a drug conviction. That's the only, that's the only comparator I think that the defense raises that's even remotely close to the jurors that were struck in this case. And so I think this is a case where the Batson issue really isn't particularly close as Judge Caproni recognized. You know, and she certainly wasn't committing clear error after observing the voir dire and the government's demeanor and exercising and explaining its strikes and finding no discriminatory purpose. Yeah, I said that's fine. That's fine for me. Okay. Judge Kamidi? Did the government use all its peremptory strikes? I, yes, your honor, we did. The Batson challenge came after we had exercised five of the six strikes and we subsequently used the six. Okay. Yeah, that wasn't clear to me from the record. That's all I have. All right. Thank you, Mr. Wren. Mr. DeCastro, you've got one minute for rebuttal. Thank you. Just a quick point on the Batson issue. Mr. Wren just said that, well, you know, Judge Caproni was very familiar with the answers. There was no need to make a lengthy record. Unfortunately, I think that that flies in the face of this court's precedent. This court has stated, we also have disapproved a trial court conducting its review of a Batson application with undue haste and ruling in a summary fashion. And I think that's exactly what happened here. With respect to the comments at oil issue, you know, I mean, I guess the court explored this, but I think there's no argument here to say that, well, I intended to talk about before her arrest. Well, you, but you did not. I mean, that might've been your intent. Intent is not part of the analysis. Inartful phrasing has consequences. And I think, you know, this went in with the jury regardless. I, of course, asked for a mistrial and I, and, you know, had to take the, the consolation prize of, of a, of a limiting instruction, but inartful phrasing has consequences. And this was clear that he was talking about when you are being arrested. Wouldn't you think in the circumstances of this case, the jury would not have rendered a guilty verdict if the government hadn't mentioned the post arrest silence in the submission? I don't, I don't know. I have no idea. I don't know if that tips the scales for somebody in that jury. I have no idea. And I also don't know if anybody sitting in that jury box said, you know, she said this was all social. I mean, what evidence do we have of that? Just her word. And the guy says, yeah, there was social, but there was all drug dealing. What evidence do we have of that? I don't know what happened in deliberations, but you know, I think that, you know, actually addressing the government's point that this was an uncontested issue. I think they said that, you know, Mr. Morrell had acknowledged this and it was somehow uncontested. I mean, first, if it was uncontested, I don't know what they would have been objecting to in the first place. So who cares if two other photos come in that just confirm what their witness had to say. And I think, no, it was no, I guess Mr. DeCastro. So, and just considering the evidence here, you heard Mr. Wren make a harmlessness error as to, harmless error argument as to both the cross-examination issue and the Doyle issue, but there was $25,000 found in, I guess, in a rubber band in her purse and sort of an fully holed up. There was cell location data. There was drugs and ledgers, drug ledgers found in her apartment. I mean, there was very strong evidence, it seems to me, of her participation in this drug trafficking conspiracy. And so I'm just inclined to be persuaded, at least by the harmlessness error, even understanding the concerns that you've raised about the Doyle issue and the limitation on cross-examination. Would you disagree that there was compelling evidence of her guilt? I would judge. First, the reason I would say is, okay, you pointed to a drug ledger. Yes, there was a drug ledger found in her boyfriend's things. There was drugs found in her boyfriend's closet. There were trips that were made. That cell location data established trips that were acknowledged by the defense. Trips that became the center point of the trial, because if you can't explain why you're going to Boston and back, then what's your explanation? And cell site does nothing but show that you're going back and forth. So there was really no issue there. Wasn't there testimony from the cooperator, or one of the cooperators, that she was on trips to either pick up money or deliver drugs, on which her boyfriend was not also present? There was, which made it even more confusing when that same cooperator testified. Well, actually, when the same cooperator stated at his plea, which I brought out at trial, and at trial, that he had no idea what her role was. No idea. Bizarre, and I think raises serious questions as to her guilt, and I think would raise serious questions in any juror's mind too, and if given the opportunity to try and show, hey, what are you doing on these trips? Well, let me show you what we're doing on those trips. As for the trips with the cooperator where her boyfriend's not also present, were you arguing that those trips simply didn't happen, or that those were also social trips? So those were local trips that he was saying. He was saying that he had gone around locally with her, and then the issue was these drug runs too. Got it. Thank you, Mr. DiCastro. We will observe the decision in this matter.